RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ANTHONY RORRER,

              *Plaintiff-Appellant,*

        *v.*

CITY OF STOW and WILLIAM KALBAUGH,

              *Defendants-Appellees.*

No. 13-3272

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:11-cv-01024—John R. Adams, District Judge.

Argued: January 22, 2014

Decided and Filed: February 26, 2014

Before: CLAY and DONALD, Circuit Judges; MAYS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Dennis R. Thompson, THOMPSON & BISHOP LAW OFFICES, Akron, Ohio, for Appellant. Frank Scialdone, MAZANEC, RASKIN & RYDER, CO., L.P.A., Cleveland, Ohio, for Appellee City of Stow. R. Scot Harvey, FISHER & PHILLIPS LLP, Cleveland, Ohio, for Appellee Kalbaugh. **ON BRIEF:** Dennis R. Thompson, Christy B. Bishop, THOMPSON & BISHOP LAW OFFICES, Akron, Ohio, for Appellant. Frank Scialdone, Neil S. Sarkar, MAZANEC, RASKIN & RYDER, CO., L.P.A., Cleveland, Ohio, for Appellee City of Stow. R. Scot Harvey, Roland J. De Monte, FISHER & PHILLIPS LLP, Cleveland, Ohio, for Appellee Kalbaugh.

---

[*]The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

1

—————————

**OPINION**

—————————

BERNICE B. DONALD, Circuit Judge.   Plaintiff-Appellant Anthony Rorrer appeals the district court's order granting summary judgment on his claims against the City of Stow, Ohio for disability discrimination and impermissible retaliation under the Americans with Disabilities Act (ADA), similar discrimination claims under Ohio law,[1] and First Amendment retaliation under 42 U.S.C. § 1983.  Rorrer also appeals the district court's dismissal of his First Amendment retaliation claim against City of Stow Fire Chief William Kalbaugh and an order limiting the scope of discovery.  Additionally, Rorrer seeks to have his case assigned to a different district judge on remand.  For the following reasons, we **AFFIRM** the district court's dismissal of Rorrer's First Amendment retaliation claim against Kalbaugh and grant of summary judgment on Rorrer's First Amendment and ADA retaliation claims against the City of Stow.  We **REVERSE** the district court's grant of summary judgment to the City of Stow on Rorrer's ADA and Ohio discrimination claims and **REMAND** those claims for trial before a different district judge.

I.

Rorrer actively worked as a firefighter for the City of Stow ("the City" or "Stow") Fire Department ("Department") from May of 1999 until July of 2008.  On July 4, 2008, Rorrer injured his right eye in a bottle-rocket accident unrelated to his work as a firefighter, losing all vision in his right eye as a result.  The City then terminated Rorrer because of his disability, known as monocular vision.

—————————————————

[1] The parties agree that Rorrer's state law disability discrimination claims rise or fall with his ADA claims.  "[W]e consider the ADA and [Ohio] state law claims simultaneously by looking to the cases and regulations that interpret the ADA." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 n.3 (6th Cir. 2008).  This Opinion accordingly will not address the state law claims separately.

A.  Rorrer's Initial Termination

On September 18, 2008, the surgeon who operated on Rorrer's eye, Dr. Singh, cleared Rorrer to return to work without restriction.  Rorrer arranged a return-to-work physical with the office of Dr. Moten, the City's official Department physician.  On September 25, 2008, Rorrer arrived at Dr. Moten's office for his appointment, but Dr. Moten was not there.  Dr. Moten's colleague, Dr. Henderson, examined Rorrer.  In 2008, Dr. Henderson would see patients for Dr. Moten approximately one day every other month.  According to Dr. Moten, Dr. Henderson has the same training as Dr. Moten and is equally familiar with the regulations governing whether a firefighter is medically qualified to work.  After examining Rorrer for approximately 15 minutes, Dr. Henderson told Rorrer he should be able to return to duty without restriction.  Dr. Henderson qualified this statement by saying that Rorrer should "just be aware of possible limitations as [Rorrer] adjust[s] to [his] new vision."  In an "Office Note" on Dr. Moten's letterhead, dated September 25, 2008, Dr. Henderson wrote:

> I will release [Rorrer] to go back to work.  I have cautioned him doing the kind of work he does, especially using a self-contained breathing apparatus and sometimes driving at high speeds due to his work as a paramedic, I have advised him to enter into this work with caution and to be quick to obtain the assistance of his colleagues.

Rorrer called Chief Kalbaugh after his appointment.  When Rorrer told Chief Kalbaugh that the doctor released him to work without restrictions, Chief Kalbaugh sounded surprised and stated, "Released?  With no restrictions?"  Chief Kalbaugh then asked, "Did you see Moten?"  Rorrer told Chief Kalbaugh that Dr. Moten was unavailable and that Dr. Henderson had examined him instead.  Rorrer intended to return to work on September 28, 2008, his next scheduled work day, but Chief Kalbaugh was "adamant" that Rorrer not return until October 1, 2008, so that "this [could be] sorted out."

Shortly after ending his telephone call with Rorrer, Chief Kalbaugh called and left a message at Dr. Moten's office, stating that he wanted a copy of the form that cleared for work "the monocular firefighter who was seen by your office earlier today."

Dr. Moten returned Chief Kalbaugh's call later that afternoon and told Chief Kalbaugh that there had been a "mistake," that Rorrer was "unfit to return to work because he was totally blind in his right eye[,] and that his office would promptly send a revised form to this effect."

Chief Kalbaugh called Rorrer at 3:02 p.m. the same afternoon and stated that "a terrible mistake had been made" and that Rorrer should call Dr. Moten. Rorrer called Dr. Moten, who told Rorrer that he "was sorry" for the "confusion" but that Rorrer could not return to work because the "fire regs" would not allow it.

B. The Department's Guidelines and the Essential Functions of a Firefighter

The parties dispute which guidelines the Department used for determining a firefighter's qualifications and the position's essential functions. Chief Kalbaugh testified that the City terminated Rorrer because his monocular vision prevented him from performing an essential function of the firefighter position, National Fire Protection Association ("NFPA") guideline 1582-9.1.3(10): "Operating fire apparatus or other vehicles in an emergency mode with emergency lights and sirens" ("Job Task 10"). The NFPA guidelines list Job Task 10 under the heading, "Essential Job Tasks." NFPA guideline 1582-9.12.3.1 states that monocular vision "compromises the [firefighter's] ability to safely perform essential [J]ob [T]ask 10." Chief Kalbaugh further testified, "Stow has always used and relied on the [NFPA] guidelines as a standard for Stow's firefighters." Rorrer disputes that the Department ever "adopted" the NFPA guidelines and claims that the City's reference to the NFPA here is mere pretext.

On March 1, 2010, Ryan Lemmerbrock, an attorney for the firefighters' union, sent a letter to Brian Reali, the Stow Law Director, questioning the appropriateness of applying the NFPA guidelines to Rorrer's situation. Quoting implementation provisions of the NFPA to which the City had not adhered, Lemmerbrock stated that "to the Union's knowledge, the City or the [Stow Civil Service Commission] has never adopted the NFPA standards. Section 1.3 of the NFPA standards" requires that fire departments adopt a "phase-in schedule for compliance with specific requirements, if needed." Lemmerbrock continued quoting the NFPA, stating that "[t]he fire department shall

incorporate the comprehensive occupational medical program's risk management pla[n] as required by NFPA 1500."  Lemmerbrock concluded:

> Again, to the Union's knowledge, none of the above requirements have been met in order to apply any of the NFPA standards to the Stow Fire Department. Furthermore, application of the NFPA standard to the bargaining unit member is a mandatory subject of bargaining, and application of the NFPA standards has never been bargained with the Union.

In his deposition, Mark Hodson, president of the Stow firefighters' union, testified that he did not believe the City had ever adopted the NFPA.  Aaron Packard, a Lieutenant in the Department, likewise stated in a sworn declaration that the City had never adopted NFPA 1582 and added that firefighters were not required to take annual physicals as mandated by those guidelines.

Dr. Moten, as the Department's official physician, was obliged to apply the Department's medical guidelines to firefighters.  In a telephone call with Dr. Moten, Rorrer asked Dr. Moten several times what "fire regs" Dr. Moten was referring to when he stated that the regulations would not allow Rorrer to return to work.  Dr. Moten told Rorrer that he had found "literature on line [sic]" the night before that formed the basis of his decision, but Dr. Moten never mentioned the NFPA guidelines by name.

When deposed by Rorrer's counsel, Dr. Moten had similar difficulty identifying what "fire regs" governed his opinion on Rorrer's fitness to work.  Rorrer's counsel asked Dr. Moten what standards he was obligated to follow when evaluating a firefighter's fitness to work, and Dr. Moten responded, "the department regulations." Rorrer's counsel pressed Dr. Moten on the issue:

Question:  Which department regs?

Dr. Moten:  The Fire's.

Question:  For the City of Stow?

Dr. Moten:  Yes.

Question:  Any other regs?

Dr. Moten:  The Fire regs.

Question:  Well that can be anything. What do you mean, Fire regs? Be specific. I want to know exactly what you're talking about.

Dr. Moten:  Let me look.

At that point, counsel for the City intervened and asked to "go off the record a second." When the deposition restarted, Dr. Moten stated, "The NFPA."  Rorrer's counsel then asked Dr. Moten if he knew what "NFPA stands for," and Dr. Moten stated that he did not.  Dr. Moten went on to say Chief Kalbaugh gave him the NFPA standards in 2003 around the time that Dr. Moten became the Department's official physician.

Rorrer's counsel proceeded to question Dr. Moten on what portions of the NFPA he had reviewed.  Dr. Moten responded, "I read the medical context of them.  And that's the part that usually applies to the work I do."  Rorrer's counsel then asked Dr. Moten what "medical context" meant, and he responded, "That's the exam portion, the requirements of the physicals."  Before Dr. Moten could answer the next question, counsel for the City intervened again, asking, "[B]efore we do this line of inquiry, can we go off the record a second again?"  When the deposition restarted, Rorrer's counsel asked again what NFPA standards Dr. Moten reviewed when he received them from Chief Kalbaugh, and Dr. Moten testified that he reviewed all of them, "the entire stack," including the appendices and all the definitions.  Dr. Moten further testified that Dr. Henderson is as familiar with the NFPA standards as Dr. Moten.

Separate from the NFPA guidelines, the City has an internal document describing the position of firefighter.  Under the heading "Essential Functions," the document contains seventeen numbered paragraphs stating functions such as "[p]erforms necessary basic and advanced life support" and "[r]esponds to fire alarms."  Each paragraph describes the task with an unqualified, mandatory verb:  "Performs," "Responds," "Records," "Observes," "Supplies"—except for one. Paragraph 9 states:  "*May* operate emergency vehicles en route to emergencies and during patient transport to hospital.  As assigned, drives and operates motor-driven firefighting equipment."

The parties disagree about the significance of the conditional language, "[m]ay operate." Chief Kalbaugh testified that:

> No Stow firefighter, including Mr. Rorrer, can on their own opt out of performing this task. In fact, it is up to me as Stow's Fire Chief or a ranking officer in charge to determine who will drive apparatus, and we simply cannot have a rule permitting certain Stow firefighters to opt out of driving fire apparatus in emergency conditions under emergency lights and sirens.

Rorrer argues that the conditional language reflects the optional nature of the task for any individual firefighter. Hodson testified that two of the stations "always" had three-man shifts and that "[i]t would be very easy to have Rorrer sit in the jump seat of an apparatus and operate the pump on any given run." According to Hodson, "[i]dentification of the driver for any given shift is up to the shift, usually by a rotation based upon seniority; accommodating Rorrer could be done by simply taking him out of the rotation." Hodson stated that "[a]ccomodation of Anthony Rorrer not being able to drive an apparatus would be very easy for the [Department] to do; driving is not an essential function of being a Stow firefighter." Packard supported Hodson's view: "It would be very easy for the [Department] to accommodate any driving restrictions for any firefighter by simply not letting them drive the apparatus." Packard testified that "[t]here is no policy regarding assigning of driving duties; the decision is left up to each shift crew on a daily basis" and that "there are some firefighters who never drive the apparatus as a matter of choice, myself included." That is possible because, "[f]or at least the past two decades, no [Department] apparatus has been dispatched on an emergency run with less than 3-man crews." Packard submitted a letter to the City stating his "willingness to accept Anthony Rorrer on [his] company." Rod Yoder, a fellow firefighter, stated in a sworn declaration: "There is no policy regarding driving[,] and the decision on who drives [is] worked out among the firefighters on a shift-by-shift basis."

C.  Rorrer's Efforts to Obtain an Accommodation

Prior to Rorrer's final termination, he sought two accommodations from the City: (1) authorization to continue working as a firefighter without driving a fire apparatus during an emergency, and (2) transfer to the Fire Prevention Bureau ("FPB") to serve as a fire inspector.

On October 7, 2008, Dr. Robert Stern, an ophthalmologist, examined Rorrer. Stern wrote a letter outlining his examination and its results.  Stern stated that "[J]ob [T]ask 10 may be compromised with only left monocular vision.  Although, many patients are able to accommodate within a few months for the field loss by head and gaze positioning during visual scanning."  Rorrer received this letter on October 21, 2008 and provided it to Hodson.  Hodson, in turn, provided it to the City.

On October 9, 2008, Rorrer emailed Patrick Graham, the Stow Human Resources Director, asking about his return status.  Graham responded by letter dated October 29, 2008, stating that, after subsequent conversations with Dr. Moten, Rorrer was no longer capable of performing the "essential functions" of a Stow firefighter.  On January 14, 2009, Rorrer sent a letter to Graham asking for a temporary assignment in the FPB until his work status was resolved.  According to Rorrer, Rick Henkel had worked in the FPB for two years as part of the City's "transitional" program for disabled employees.  On January 29, 2009, Graham responded that Rorrer could not work in the "transitional" work program because his injury was not work related.

On February 5, 2009, Rorrer attended a meeting with several Stow officials. Those present included Graham, Chief Kalbaugh, Stow attorney John Scavelli (the "Stow officials"), union president Mark Hodson, Steve Wood, and Rorrer's attorney, Dennis Thompson.  Although Rorrer and Thompson had asked that Dr. Moten be present, he did not attend. Rorrer and Thompson presented Dr. Stern's letter to the Stow officials.  The officials refused to discuss a temporary or permanent re-assignment for Rorrer.

On July 14, 2009, Rorrer, through union president Hodson, requested permanent placement in the FPB as an accommodation. The parties dispute whether the FPB had a permanent vacancy Rorrer was qualified to fill. In an email to Graham, Hodson stated:

> As you are well aware the Fire Chief has been making efforts to reduce overtime. He has gone before the council asking for additional staffing to handle the problem, and was allowed one new hire. He then asked for the ability to promote three additional lieutenants, which was approved. As you also know, one of those promotions will be Rick Ray who will come out of the [FPB], leaving them one short in prevention. In our last labor management committee meeting held in the Fire Chief's conference room. We [sic] discussed the importance of the third employee in prevention, as well as the training captain position. The Chief stated that he worked hard to get those positions and did not want to give them back. We have stated before, that Tony Rorrer has the expertise, training, and certification to work as a fire inspector in the FPB, and now there is an opening. . . . While the City has placed these impossible conditions for Tony's return to work on duty as a firefighter/paramedic, are they [sic] also going to say he cannot be an inspector? He is certified in the state of Ohio as a firefighter, a paramedic, and a fire inspector. He also has a VALID state of Ohio driver's license.

Chief Kalbaugh disputes both that a permanent vacancy existed and that Rorrer was qualified to work in the FPB. (PageID 2301.) Chief Kalbaugh testified:

> Stow's Fire Department does have a division called the [FPB]. During Rorrer's employment (and presently), there were two full time positions in the [FPB], both of which were filled by firefighters with rankings higher than Rorrer's. Neither of these positions has been vacant since Rorrer suffered his eye injury. Anyone in these full time [FPB] positions must be able to at all times perform all the essential job requirements of a Stow firefighter, including driving fire apparatus in emergency mode under emergency lights and sirens . . . . Also, the position of "Fire Inspector" does not exist; it is merely a firefighter assigned to a particular job duty. Further, Stow has no permanent light duty assignments for a full time fire inspector in the [FPB]. Rather, this Bureau is occasionally used as a temporary light duty position intended for firefighters who are rehabilitating from temporary injuries until they recover and are released to full duty . . . . Mr. Rorrer, after his severe eye injury on July 4, 2008, has never been released back to work by Stow's fire department physician, Dr. Moten in either temporary duty, light duty, or full duty.

Rorrer disputes Chief Kalbaugh's contention that there were only two permanent positions in the FPB, arguing that Rick Ray occupied a third permanent position.

On October 12, 2009, the City sent Rorrer a letter informing him of his involuntary separation from the Department. Rorrer subsequently filed this suit in the United States District Court for the Northern District of Ohio on May 19, 2011.

### D.  Alleged Retaliation

In 2004, Rorrer testified in an arbitration proceeding between the union and the City, contesting the Department's three-day suspension of Yoder, a fellow firefighter. Rorrer testified that he was present during an incident between Yoder and Smith, another Stow firefighter. Rorrer contested Smith's allegations concerning the incident, stating that Smith was the aggressor in the confrontation. The arbitration panel concluded that, although the City had just cause to suspend Yoder, the City had "failed to establish that [Yoder] committed each of the offenses for which he was charged."

Packard offered testimony that Chief Kalbaugh had personally threatened retaliation against any firefighter who testified against the Department. The alleged threat came within days of another matter involving Yoder, who had been subject to criminal charges for removing a microphone from a radio in a non-emergency vehicle assigned to a civilian employee. Within three to six days after dismissal of the criminal case, Chief Kalbaugh telephoned Packard at Station 3 and told him, "[A]ny officer that participates in defense is done in the City of Stow. Lieutenant won't make Captain and Captain won't make Chief." Chief Kalbaugh told Packard that he was passing this warning on from Stow's city council.

Packard relayed this information to William Whitaker, Yoder's attorney, who assisted Packard with stating this information in an affidavit. Packard signed the affidavit and returned it to Whitaker. An unsigned copy of the affidavit appears in the record, dated March 2, 2005. In a conversation between Packard and Chief Kalbaugh in May 2005, Chief Kalbaugh repeated the statement to Packard. Chief Kalbaugh also

stated, "Those 2 guys who signed the affidavits, they lied. They have no future here in Stow."

During his deposition in this case, Hodson testified that he had apprehension about testifying because of possible retaliation. He testified that he believed that four individuals, including Rorrer, who had testified in the Yoder arbitration or a similar dispute between a firefighter and the Department, were now "gone" because of their testimony.

### E. The District Court's Discovery Orders

In a status conference on January 4, 2012, Rorrer provided the City and Chief Kalbaugh ("Defendants") a preliminary witness list that identified twenty-nine individuals. On January 6, 2012, the district court ordered Rorrer to identify, within fourteen days of the status conference, the "five witnesses from his list most likely to be utilized at trial in this matter to facilitate any future depositions." The district court did not impose the same numerical limit on Defendants, stating, "Defendants shall provide Plaintiff with witness lists that reasonably identify only those individuals that will likely be utilized at trial" within the same period. The order emphasized: "Any witness that has not been identified by the end of this 14 day period will not be permitted to be utilized at trial absent extraordinary circumstances."

Rorrer complied within the deadline, filing a list of "6 persons that he intends, at a minimum, to call as witnesses in this case: Dr. Robert Stern, Mark Hodson, Marvin T. Conley, Michael Myers, Patrick Gaffney, [and] Don Adams." Rorrer included in his filing an objection to "any limitations imposed at this juncture . . . on the number of witnesses [Rorrer] requires to adequately prosecute this case."

On January 20, 2012, Defendants filed a Motion in Limine seeking to strike Marvin Conley and Michael Myers, two of the witnesses on Rorrer's list, each of whom is a firefighter with monocular vision. Rorrer opposed the motion. The district court rejected Rorrer's argument that Conley's and Myers' testimony was relevant "because

it demonstrates that an individual with his condition can safely perform the essential functions of a firefighter." The court granted Defendants' motion, stating:

> Assuming *arguendo* that such testimony would have some relevance, the burden in obtaining such evidence far outweighs any benefit it might provide. Contrary to Rorrer's assertions, if he seeks discovery from these firefighters, Defendants would be entitled to review the medical records of both of these non-parties. The process for obtaining those records would certainly be lengthy, time-consuming, and expensive. Rorrer contends that "the fact that the firefighter has monocular vision is the only pertinent inquiry." Doc. 64. However, this presupposes that all monocular vision impairments are identical. Of course, no reasonable defendant would simply assume that these firefighters' impairments are identical to Rorrer's impairment. Instead, the particular impairment of each of these firefighters would be examined, opening their medical records to scrutiny.

On May 1, 2012, the City and Chief Kalbaugh filed separate motions for summary judgment. On June 15, 2012, Rorrer responded, attaching numerous exhibits, including declarations by Yoder, Packard, Jerome Miller, and Steve Wood. On June 25, 2012, Defendants moved to strike each of these declarations, stating that these witnesses were not included in the January 18, 2012 witness list Rorrer submitted in response to the district court's order. Rorrer opposed the motion, stating that it only became clear through discovery that certain witnesses would be necessary to refute "the City's bald representations that it had adopted NFPA 1582 when, in fact, [this was a] plain misrepresentation." On February 4, 2013, the district court addressed the motion to strike in its order granting summary judgment:

> Initially, the Court finds that Rorrer clearly contravened this Court's order regarding the identification of witnesses when he provided the declarations at issue. The Court's order was designed to ensure that only necessary depositions would occur. It was not designed to allow Rorrer to sandbag Stow with wholly unanticipated declarations. However, as the Court's order herein is not altered by allowing those declarations to remain in the record, the motion is DENIED as MOOT.
>
> The Court would note that to the extent a reviewing court would conclude that a genuine issue of material fact is generated by those precise declarations, the Court would find them to be properly stricken

as in direct violation of Rorrer's obligation to identify witnesses in a timely manner to facilitate deposition practice.

Rorrer included two of the witnesses whose declarations are at issue, Yoder and Packard, in his January 4, 2012 witness list.

## F.  Procedural History

On January 5, 2012, the district court granted Chief Kalbaugh's motion to dismiss Rorrer's § 1983 claim against him.  On May 1, 2012, the City and Chief Kalbaugh filed individual motions for summary judgment as to all claims ("Motions"). Rorrer opposed the Motions, filing a response on June 15, 2012.  On June 22, 2012, Rorrer and Chief Kalbaugh submitted a Stipulation of Dismissal for all existing claims against Chief Kalbaugh in his individual capacity.  On June 25, 2012, the district court approved the stipulation and dismissed those claims, but Rorrer did not waive his right to appeal the earlier dismissal of his First Amendment § 1983 claim against Chief Kalbaugh.  On February 2, 2013, the district court granted the City's motion for summary judgment as to all claims and entered judgment in favor of Stow.  Rorrer filed a timely Notice of Appeal on March 1, 2013.  This appeal followed.

## II.  Standard of Review

This Court reviews an order granting summary judgment de novo.  *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  "Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment; rather, the evidence should be viewed in the light most favorable to the non-moving party."  *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999); *see also Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001) (citing *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "[A]ny direct evidence offered by the plaintiff

in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).

### III.  ADA Discrimination Claim

#### A.  Legal Framework

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability."  42 U.S.C. § 12112(a).  The statute defines "discriminate" to include "not making reasonable accommodation to the known physical . . . limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship."  *Id.* § 12112(b)(5)(A).  An "otherwise qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* § 12111(8).

"[I]f the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision," this Court proceeds to a burden-shifting analysis.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315-16 (6th Cir. 2012) (en banc).  First, the plaintiff must establish a prima facie case by showing "that he is disabled and otherwise qualified for the position, either with or without reasonable accommodation."  *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).  Once the plaintiff has established a prima facie case, "the burden shifts to the defendant to show that accommodating the plaintiff would impose an undue hardship on the operation of its business."  *Id.*; *see also Monette*, 90 F.3d at 1183 n.10, 1186 ("The employer will bear the burden of proving . . . that a proposed accommodation would impose an undue hardship.").

To provide a reasonable accommodation, an employer may be required to modify the responsibilities of a disabled employee's existing job or transfer the employee to a vacant position with different responsibilities.  *See* 29 C.F.R. § 1630.2(o); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007).  If an employee seeks to

stay in his or her current job, the term reasonable accommodation means: "Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position [to stay in the position]." 29 C.F.R. § 1630.2(o). A suggested accommodation is not reasonable if it requires eliminating an "essential" function of the job. *Id.*; *see also* 42 U.S.C. § 12111(8).

Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith*, 703 F.3d at 926. Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires. The term . . . does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential because (1) the position exists to perform the function, (2) a limited number of employees are available that can perform it, or (3) it is highly specialized. *Id.* § 1630.2(n)(2). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (citation omitted); *see also Keith*, 703 F.3d at 925-26. Two factors are "the employer's judgment as to what functions of a job are essential" and an employer's "written description" of the job. 42 U.S.C. § 12111(8). The regulations accompanying the ADA also direct a court to consider five additional factors:

> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(iii)-(vii).

At the summary judgment stage, the employer's judgment will not be dispositive on whether a function is essential when evidence on the issue is "mixed." *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012); *see also Keith*, 703 F.3d at 926. If an employer's judgment about what qualifies as an essential task were conclusive, "an employer that did not wish to be *inconvenienced* by making a reasonable accommodation could, simply by asserting that the function is essential, avoid the clear congressional mandate that employers mak[e] reasonable accommodations." *Holly v. Clarison Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007) (alteration in original) (quoting 42 U.S.C. § 12112(b)(5)(A)) (internal quotation marks omitted).

Written job descriptions are also not dispositive. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("[A]n employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description."). Testimony from the plaintiff's supervisor that a job function is actually marginal may effectively rebut a written description that states that a job function is essential. *See Holly*, 492 F.3d at 1257. In *Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir. 2001), the Third Circuit reasoned that "conflicting deposition testimonies" concerning a job's essential functions required reversal of a grant of summary judgment to the employer. *Id.* at 283. "Although the employer's judgment and the written job descriptions may warrant some deference, [the plaintiff] put forth considerable evidence that contradicts [the employer's] assertions," creating a "genuine issue of material fact [concerning] essential function." *Id.*

In *Keith*, this Court agreed with the employer that "communication" was an essential part of the job of lifeguard, but rejected the employer's judgment that hearing was essential to the position. 703 F.3d at 926-27. The *Keith* court held that the accommodations suggested by the plaintiff were reasonable, including adopting a purely visual scanning technique to detect distressed swimmers, shaking his head and using hand motions to enforce rules, using laminated cards to communicate "essential" messages to patrons, and using an employer-provided interpreter during occasional staff

meetings.  *Id.* at 922, 926-27.  These proposals satisfied Keith's initial burden of suggesting a reasonable accommodation.  *See id.*

If a plaintiff's requested accommodation is a transfer to a different position, "employers have a duty to locate [a] suitable position[] . . . ." *Kleiber*, 485 F.3d at 870. "Nonetheless, to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id.*  "[A]n employer need only reassign the employee to a vacant position." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998).

The ADA also "mandates an individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position." *Keith*, 703 F.3d at 923 (internal quotations and citation omitted).  The individualized inquiry is an "interactive process" in which "both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871.  The purpose is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* (citing 29 C.F.R. § 1630.2(o)(3)).  The ADA mandates this process to ensure that employers do not disqualify applicants and employees based on "stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job." *Keith*, 703 F.3d at 923.  "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).

This Court and our sister circuits have identified several situations that may indicate a failure to participate in the interactive process in good faith.  Failing to discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee may demonstrate a lack of good faith. *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 622 (5th Cir. 2009).  Similarly, failing to assist an employee in seeking an accommodation may suggest bad faith. *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 902 (8th Cir. 2006). This Court held in *Keith* that a cursory medical examination and summary conclusion

that a disabled individual is not fit for employment violates an employer's duty to engage in the interactive process in good faith.  703 F.3d at 924.

Although mandatory, failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation.  *See id.* at 929; *Brietfielder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005).

## B.  Essential Function

The district court correctly found, and the parties do not dispute, that the City relied on Rorrer's disability in making an adverse employment decision against him. The district court then properly proceeded to address the primary dispute between the parties:  whether the City complied with the ADA in relying on Rorrer's disability as a basis for terminating him.  *See Monette*, 90 F.3d at 1186.

The district court erred, however, in finding there was no genuine dispute as to whether driving a fire apparatus under emergency lights was an essential function of a Stow firefighter.  The district court based this finding on its conclusion that the Department utilized the NFPA guidelines for determining a firefighter's essential functions.  In the alternative, the lower court gave deference to Chief Kalbaugh's assertion that this function was essential, finding corroboration in the Department's internal list of essential functions and Rorrer's admission that he "could not refuse" to drive an apparatus if instructed to do so.

The district court found "no issue of fact surrounding whether Stow utilized the NFPA guidelines" and credited the City's position that NFPA essential Job Task 10, "[o]perating fire apparatus or other vehicles in an emergency mode with emergency lights and sirens," applied to Rorrer.  The court stated that, "even if Stow has not formally adopted the NFPA guidelines, the record is replete with evidence that Stow's chief, Chief Kalbaugh, and its physician, Dr. Moten, relied upon those guidelines" in determining a firefighter's essential functions.

The record is actually replete with evidence that the Department never adopted NFPA guidelines and did not rely on them in determining that Rorrer was unfit to serve as a Stow firefighter. Multiple witnesses testified that the Department never adopted the NFPA guidelines. The Department did not execute the NFPA's implementation plan, and did not require the annual physicals mandated by the NFPA.

The record suggests that Dr. Moten was not familiar with the NFPA guidelines and did not rely on them in finding Rorrer unfit to serve as a firefighter. When asked by Rorrer what "fire regs" would prohibit Rorrer from returning to work, Dr. Moten referred vaguely to "literature on line [sic]" that he had found the night before, and he did not reference the NFPA. When deposed, Dr. Moten initially could not identify what "fire regs" mandated that a monocular firefighter was unfit to serve. When asked for specifics, he repeatedly referred vaguely to "fire regs" before finally stating, "Let me look." Only after counsel asked for a break was Dr. Moten able to identify the "NFPA," but he still could not say what those initials represented. When asked whether he had read the guidelines when Chief Kalbaugh gave them to him in 2003, Dr. Moten gave contradictory answers, initially stating that he had read the portions relating to physicals and then, after another intervention by counsel, stating that he had read the "entire stack."

The district court did not reference any of this evidence when finding that "the record is replete with evidence that . . . Moten relied upon those guidelines" in finding Rorrer unfit to serve as a firefighter. Drawing all reasonable inferences in favor of Rorrer, a reasonable jury could find that the Department had never adopted the NFPA guidelines, that Dr. Moten's determination was not based on the application of the NFPA's list of essential functions of a firefighter, and that the City's reference to the NFPA was an ex post pretext.

The district court also found that, even absent the NFPA guidelines, there was no genuine dispute about whether operating a fire apparatus during an emergency was an essential function of a Stow firefighter. The court reasoned that it was "required to give deference to Stow's judgment regarding what the essential functions of the position

were." The court supported its holding by referencing the City's internal list of essential functions and Rorrer's admission that he "could not refuse" to drive an apparatus if instructed to do so.

Contrary to the district court's opinion, however, federal courts are not "required to give deference to [the employer's] judgment regarding what the essential functions of the position [are]" when the record suggests that there is a genuine dispute of material fact on the issue. *See Keith*, 703 F.3d at 925-26. The ADA states that the court should give "consideration" to the employer's determination, not "deference," with the latter incorrectly implying that the employer's position creates a strong presumption in its favor. *See* 42 U.S.C. § 12111(8); *Feldman*, 692 F.3d at 755. The employer's determination about what functions are essential is certainly given weight, but it is one of seven factors the court should consider, including "[t]he amount of time spent on the job performing the function" and "[t]he consequences of not requiring the [employee] to perform the function." 29 C.F.R. § 1630.2(n)(3)(iii), (iv); *Feldman*, 692 F.3d at 755. The district court appears not only to have given deference to the City's position, but to have considered only the City's position, failing to consider all of the § 1630.2 factors while drawing all reasonable inferences in Rorrer's favor as required at the summary judgment stage.

According to Rorrer, the consequences of forbidding a firefighter from driving an apparatus during an emergency would be minimal. Driving a fire apparatus during an emergency is not a "highly specialized" task or a job requirement that only "a limited number of employees are available" to do. 29 C.F.R. § 1630.2(n)(2); *Skerski*, 257 F.3d at 280. Rather, Rorrer brought forth direct evidence that such an accommodation would be "very easy" for the Department to implement. According to that direct evidence, some Stow firefighters never drive an apparatus "as a matter of choice." The district court was required to accept this evidence as true. *Close*, 379 F.3d at 416. When read in the light most favorable to Rorrer, the record is clearly "mixed" about whether driving an apparatus during an emergency was an essential task for a Stow firefighter. *Feldman*, 692 F.3d at 755; *see also Keith*, 703 F.3d at 926.

The district court also considered the City's job description of a firefighter, a relevant factor in determining a position's essential functions, but erred in finding the job description dispositive of the issue. *See Skerski*, 257 F.3d at 277. Under the heading "Essential Functions," the City's job description lists seventeen job requirements, each of which describes a duty with an unqualified verb, such as "[p]erforms necessary basic and advanced life support" and "[r][esponds to fire alarms." There is one exception. Paragraph 9 states, "[m]ay operate emergency vehicles en route to emergencies and during patient transport to hospital." This description is the only one that incorporates conditional language. The district court stated that the City's internal list of essential functions "mimic[ked]" those of the NFPA, but the word "may" is a notable addition to the list not present in NFPA Job Task 10. A reasonable jury could find that the addition of the conditional "may" to a task in a list that otherwise mirrors the NFPA's mandatory language reflects the peculiarity of the Department's rotation policy, in which it is essential for some firefighters to drive an apparatus but not necessary that every firefighter do so. The testimony of multiple Stow firefighters corroborates this reading. The district court likewise should have considered the statement of Packard—a supervisor who asked to have Rorrer serve in his company—in his declaration that driving an apparatus during an emergency was not an essential function of the job. *See Holly*, 492 F.3d at 1257.

The City's written job description and the conflicting testimony about the essential functions of a Stow firefighter are similar to the dispute in *Skerski*. 257 F.3d 273. There, the Third Circuit held that the job description's statement of "[m]ay climb poles to perform line transfers"—listed as an essential function—combined with the employer's insistence that climbing was essential, did not eliminate the genuine dispute created by the "conflicting deposition testimonies." *Id.* at 276, 283 (alteration in original). Evidence in *Skerski* and here suggests that the respective employees could do their jobs for years without performing the listed function. *Skerski*, 257 F.3d at 281. In both cases, the employer did not hire employees solely to perform the listed function, and the function did not require particular expertise. *See id.* at 280.

The district court dismissed any relevance to the presence of the term "may," stating that "Rorrer concedes . . . he could not refuse to drive an apparatus if ordered to do so" and "the record is replete with evidence that no firefighters within Stow were able to opt out of any of the essential functions" detailed in the Department's job description. An "essential" task, however, is not any task that an employee would feel compelled to perform if ordered to perform it by his or her employer. *See Holly*, 492 F.3d at 1258 (holding that an employer cannot simply assert that a function is essential to "avoid the clear congressional mandate that employers mak[e] reasonable accommodations"). That definition—"a task is essential if the employer orders it done"—contradicts a central purpose of the ADA, which is to prohibit employers from requiring disabled employees to perform certain tasks that the law deems nonessential. *See, e.g.*, *Davidson*, 337 F.3d at 1191 ("[A]n employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description."). Determining whether a function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith*, 703 F.3d at 926. The district court thus erred in prematurely deciding whether driving an apparatus during an emergency was an "essential" function of a Stow firefighter because the evidence creates a genuine dispute about that fact.

## C.  Reasonable Accommodation

Prior to Rorrer's final termination, he sought two accommodations from the City: (1) authorization to continue working as a firefighter without driving a fire apparatus during an emergency, and (2) transfer to the FPB to serve as a fire inspector. The district court erred in finding that, as a matter of law, both of Rorrer's requested accommodations were unreasonable.

The district court based its finding as to driving on the errant premise that no genuine issue of material fact existed about whether driving a fire apparatus during an emergency was an essential function of a Stow firefighter. The law places a significant burden on employers to accommodate an employee's injuries. *See, e.g.*, *Keith*, 703 F.3d at 926-27. Shifting marginal duties to other employees who can easily perform them is

a reasonable accommodation.  *See id.*; *see also* 29 C.F.R. §§ 1630.2(n)(1), (3).  Drawing all reasonable inferences in favor of Rorrer, the suggested accommodation that he not drive an apparatus during an emergency was reasonable because it would have excused him from performing a marginal function that could have "easily" been performed by his colleagues.  29 C.F.R. § 1630.2(n)(1); *Keith*, 703 F.3d at 926-27.  The district court erred in prematurely determining that, as a matter of law, Rorrer could not carry his burden of showing that the requested accommodation was reasonable.  *See, e.g.*, *Keith*, 703 F.3d at 926-27; *Monette*, 90 F.3d at 1186.

Even if operating an apparatus during an emergency were an essential function of a Stow firefighter, the district court erred in finding that Rorrer's proposed accommodation of transfer to the FPB was unreasonable.  The district court so found because it concluded that Rorrer's contentions that a vacancy existed were "not based in fact."  According to the district court:

> Rorrer appears to rely upon the fact that there was an individual, Rick Henkel, that remained on light duty work in the Bureau for nearly two years . . . . [T]here is simply no dispute that any such assignment in the Bureau is designed to transition the employee back to full time work.  Rorrer cannot be transitioned.

The court's finding is two-fold:  first, that there was no vacant permanent position in the FPB; and second, that Rorrer was unfit, as a matter of law, to serve in the FPB because his condition permanently precluded him from operating an apparatus during an emergency.  *See Cassidy*, 138 F.3d at 634 ("[A]n employer need only reassign the employee to a vacant position.")  The district court erred on both counts.

There is a genuine dispute between the parties as to whether there was a vacancy in the FPB when Rorrer made his request for a transfer.  Chief Kalbaugh states that there were only two permanent positions in the FPB, both of which were filled.  Rorrer states that there was a third permanent position occupied by Rick Ray and that it became vacant when Ray received a promotion.  The email Hodson sent to Graham, stating that "Rick Ray . . . will come out of the [FPB], leaving them one short in prevention," corroborates Rorrer's testimony.  Because the court must accept "as true" Rorrer's

testimony and Hodson's email, there is a genuine dispute of material fact as to whether a vacancy existed in the FPB. *See Close*, 379 F.3d at 416.

The City argues that, even if a permanent position existed in the FPB, Rorrer's transfer request was unreasonable because "the position of 'Fire Inspector' does not exist; it is merely a firefighter assigned to a particular job duty." *See Kleiber*, 485 F.3d at 870 ("[T]he plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position."). This argument lacks merit. The position in the FPB was that of an inspector, designed to prevent fires, not fight them. The City does not dispute that Rorrer had the "expertise, training, and certification" to fulfill these job duties. Rather, the City argues that Rorrer was unqualified because the Department's job description of someone functioning as a fire inspector is "firefighter," which includes the task of driving an apparatus during an emergency. The City's unwillingness to modify a job description to accommodate Rorrer, even though that modification would not have required any change in job duties, falls short of the City's obligation "to locate a suitable position" for Rorrer after he identified a vacancy and requested a transfer. *See Kleiber*, 485 F.3d at 870.

## D. Undue Burden

The district court erred in finding that Rorrer's requested accommodation not to drive during an emergency would place an undue burden on the City. The district court based this decision entirely on its finding that this function was "quite clearly a business necessity." Rorrer met his initial burden to show that the proposed accommodation was "reasonable," shifting the burden to the City to prove that the accommodation would amount to an undue burden. *Keith*, 703 F.3d at 923; *Monette*, 90 F.3d at 1186. The City's argument that excusing Rorrer from driving an apparatus during an emergency would impose an undue burden mirrors its argument that this function is essential. Because the record suggests that the City could have easily met the requested accommodation, Stow failed to establish undue burden at the summary judgment stage. *Monette*, 90 F.3d at 1186.

E.  Interactive Process

The district court likewise erred in finding that Rorrer's "claim that Stow failed to engage in the interactive process must . . . fail" because Rorrer never proposed a reasonable accommodation.  Rorrer proposed two reasonable accommodations, making a failure to engage in the interactive process an independent violation of the ADA.  *See Keith*, 703 F.3d at 929; *Brietfielder*, 151 F. App'x at 385.  There is a genuine dispute of fact as to whether the City participated in "good faith," *Kleiber*, 485 F.3d at 871, in an "individualized inquiry" to determine whether the City could accommodate Rorrer's disability.  *Keith*, 703 F.3d at 923.

The parties do not dispute that Rorrer was fit to perform all functions of a firefighter except driving an apparatus during an emergency.  Despite evidence that driving an apparatus during an emergency was not an essential function of a Stow firefighter, however, the City apparently never considered accommodating Rorrer.  After Dr. Henderson initially cleared Rorrer to return to work, Chief Kalbaugh intervened to change the decision, at which point Dr. Moten reversed Dr. Henderson's decision without first examining Rorrer.  *See Keith*, 703 F.3d at 924 (holding that to conclude after a brief medical examination that a disability precludes employment violates the ADA).  Chief Kalbaugh never inquired of those who would serve on Rorrer's crew whether they could take Rorrer out of the driving rotation, "because [of his belief that Stow] simply cannot have a rule permitting certain Stow firefighters to opt out of driving fire apparatus in emergency conditions."  The City's immediate conclusion that Rorrer was unfit to serve as a firefighter suggests bad faith and falls short of its obligation under the ADA to assist an employee seeking an accommodation.  *Canny*, 439 F.3d at 902.

The record also suggests that the City did not seek, in good faith, to accommodate Rorrer's request for a transfer to the FPB.  At a meeting on February 5, 2009, between Rorrer and Stow officials, the City officials "refused to discuss" reassignment.  *See Chevron Phillips*, 570 F.3d at 622 (holding that the failure not to discuss a reasonable accommodation in a meeting about the employee's injury and position with the employer suggests bad faith).  Although Chief Kalbaugh states that he

explored a possible accommodation for Rorrer in the FPB, Chief Kalbaugh dismissed that option because Rorrer "would still need to perform all the essential job duties as a firefighter." Chief Kalbaugh's statement underscores the City's lack of good faith in seriously seeking accommodation. *Keith*, 703 F.3d at 923 (employers should seek to accommodate "the effect . . . [a disability] may have on [on the particular individual's] ability to perform the job"). If placed in the FPB, Rorrer would "need" to perform the function of operating a fire apparatus under emergency lights only because the City's policy said so. There is no indication on the record that a fire inspector ever actually performed this function. Had the City engaged in a good faith effort to accommodate Rorrer, the record suggests that Rorrer could have served in the FPB without any modification of the actual job duties that position entails.

For the foregoing reasons, we hold that the district court improperly granted summary judgment to the City on Rorrer's ADA and Ohio discrimination claims.

## IV.  ADA Retaliation Claim

The ADA provides:  "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Because Rorrer does not claim to have direct evidence of retaliation, this Court analyzes his claim for ADA retaliation using the *McDonnell-Douglas* burden-shifting approach. *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). The plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Id.*  Establishing a prima facie case of retaliation is a "low hurdle." *Gribcheck*, 245 F.3d at 551 (holding that the plaintiff "easily" established that he was engaged in protected activity because the alleged retaliation was for filing a discrimination claim).

The ADA is not, however, a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA.  42 U.S.C. § 12203(a).  "Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 484-85 (S.D.N.Y. 2013) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  In *Reynolds v. American National Red Cross*, 701 F.3d 143 (4th Cir. 2012), the Fourth Circuit held that the plaintiff's claim that his employer retaliated against him for filing a workers' compensation claim failed because "a workers' compensation claim is not something . . . covered by the ADA." *Id.* at 154.  The ADA is a discrimination statute and does not protect an employee who participates in arbitration proceedings contesting employment decisions that do not involve any claims of discrimination. *Compare Jackson v. J. Lewis Crozer Library*, 445 F. App'x 533, 536-37 (3d Cir. 2011) (holding that because the accommodation plaintiff sought was to home school her child and not to accommodate her disability, she failed to meet a prima facie case of retaliation) *with Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d. Cir. 2010) (holding that requesting an accommodation because of a disability is protected activity under the ADA).

Rorrer claims that the City retaliated against him for testifying on Yoder's behalf in an arbitration proceeding, not for requesting an accommodation for his monocular vision or another act related to his disability.  The facts underlying Yoder's suspension and the City's conduct in disciplining Yoder do not involve any allegations of discrimination.  Rorrer thus cannot establish a prima facie case of ADA retaliation because the ADA does not cover the activity for which he allegedly suffered retaliation. *See Gribcheck*, 245 F.3d at 551.  We accordingly hold that the district court did not err when it granted summary judgment to Stow on Rorrer's ADA retaliation claim.

## V.  First Amendment § 1983 Claims

Rorrer brought 42 U.S.C. § 1983 claims for First Amendment retaliation against both the City and Chief Kalbaugh.  The district court granted Chief Kalbaugh's motion

to dismiss Rorrer's claim against him and granted the City's motion for summary judgment as to the claim against it.

For a public employee to establish a claim of First Amendment retaliation, he must show that (1) he engaged in constitutionally protected speech or conduct; (2) the employer took an adverse action against him that would deter an ordinary person from engaging in that conduct; and (3) there is a causal connection between elements one and two. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006); *see also Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (holding that causation is present when "the protected speech was a 'substantial' or 'motivating factor' in the adverse action"). This Court applies a two-part inquiry to determine whether a plaintiff engaged in constitutionally protect speech or conduct, asking (1) if the speech involved is a "matter of public concern," and (2) "if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Scarbrough*, 470 F.3d at 255.

"Whether the speech at issue involves a matter of public concern is a question of law for the court." *Farhat*, 370 F.3d at 589. The Supreme Court's decision in *Connick v. Myers*, 461 U.S. 138 (1983), is its "most instructive case on this issue." *Cochrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1050 (6th Cir. 2001). In *Connick*, the Supreme Court held that government employers are given "wide latitude in managing their offices" and their decisions "are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." 461 U.S. at 146 (citations omitted). Whether an employee's speech addresses a matter of public concern depends on whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community," determined by "the content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 146, 147-48.

The content of the speech is particularly relevant. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 (6th Cir. 1995) ("The linchpin of the inquiry is . . . the extent to which the speech . . . impacts our social and/or political lives."). Speech in the context of internal personnel disputes typically does not relate to matters of public

concern. *See Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2501 (2011) ("A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context."); *Van Compernolle v. City of Zeeland*, 241 F. App'x 244, 250 (6th Cir. 2007) ("[The plaintiff's] participation in other officers' grievance procedures was not a matter of public concern."); *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) ("Such matters of public concern are to be contrasted with internal personnel disputes . . . .").

This Court has yet to address squarely whether sworn testimony in a judicial proceeding by a public employee elevates that speech to the level of public concern regardless of its content, but some of our sister circuits have. *See, e.g.*, *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 887 (3d Cir. 1997); *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989). At least four circuits have decided that the mere act of giving sworn testimony is not enough for speech to rise to a matter of public concern. *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926 n.6 (9th Cir. 2004) (citing *Maggio v. Sipple*, 211 F.3d 1346, 1352-54 (11th Cir. 2000); *Padilla v. S. Harrison R–II Sch. Dist.*, 181 F.3d 992, 996-97 (8th Cir. 1999); *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1505 (7th Cir. 1994); *Arvinger v. Mayor & City Council of Balt.*, 862 F.2d 75, 77-78 (4th Cir. 1988)). No circuit has adopted the rule that sworn testimony in a private arbitration is on a matter of public concern, regardless of content.

The content of Rorrer's testimony at Yoder's arbitration did not relate "to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. Rorrer's testimony was purely a private matter, concerning the facts surrounding a colleague's discipline by the Department. Although Rorrer testified under oath, sworn testimony in a private proceeding is not sufficient to elevate speech of purely private content to a matter of public concern. *See, e.g.*, *Arvinger*, 862 F.2d 75, 78 (holding that an employee's testimony at a coworker's fair employment hearing did not touch on a matter of public concern). The district court therefore properly dismissed Rorrer's First

Amendment retaliation claim against Chief Kalbaugh and properly granted summary judgment to the City on Rorrer's First Amendment retaliation claim against it.

## VI.  Motion in Limine Excluding Evidence Related to Other Monocular Firefighters

Under the Federal Rules of Civil Procedure, a district court may "limit the . . . extent of discovery . . . if it determines that . . . the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C).  This Court reviews for abuse of discretion a district court's limitation on the discovery process. *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997).  An abuse of discretion exists when a reviewing court is firmly convinced that a mistake has been made. *Ross v. Duggan*, 402 F.3d 575, 581 (6th Cir. 2004) (citation omitted).

When it granted the City's Motion in Limine to prevent Rorrer from seeking discovery from two other individuals with monocular vision that currently serve as firefighters, the court below found:

> Contrary to Rorrer's assertions, if he seeks discovery from these firefighters, Defendants would be entitled to review the medical records of both these non-parties. The process for obtaining these records would certainly be lengthy, time-consuming, and expensive. Rorrer contends that 'the fact that the firefighter has monocular vision is the only pertinent inquiry.' However, this presupposes that all monocular vision impairments are identical. Of course, no reasonable defendant would simply assume that these firefighters' impairments are identical to Rorrer's impairment. Instead, the particular impairment of each of these firefighters would be examined.

The district court's conclusion that Rorrer's requested discovery would create "a burden or expense . . . [that would] outweigh its likely benefits" was not unreasonable. Fed. R. Civ. P. 26(b)(2)(C).  Because this Court does not possess a firm conviction that a mistake has been made, the district court's decision to deny Rorrer's requested discovery was not an abuse of discretion.

VII.  Rorrer's Request for Reassignment on Remand

Rorrer alleges that the district judge has demonstrated bias against him and requests that we order the case reassigned to another judge upon remand.  Under 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The purpose of this statute is "to avoid not only partiality but also the appearance of partiality."  *In re Reassignment of Cases*, 736 F.3d 118, 123 (2d Cir. 2013).  This Court possesses the power, under appropriate circumstances, to order the reassignment of a case on remand pursuant to 28 U.S.C. § 2106.  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 580 (6th Cir. 2013).  To determine whether reassignment is necessary, this Court considers:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532-33 (6th Cir. 2012) (citation omitted).  "Reassignment is an extraordinary power and should be rarely invoked."  *Id.* (internal quotation marks and citation omitted).

Rorrer requests reassignment to a different judge based on his contention that the district court's handling of discovery in this case suggests that the district judge may be biased against him.  First, the district court ordered Rorrer to identify, within fourteen days of the January 4, 2012 status conference, "five witnesses from his list most likely to be utilized at trial in this matter to facilitate any future depositions . . . ."  The order emphasized: "Any witness that has not been identified by the end of this 14 day period will not be permitted to be utilized at trial absent extraordinary circumstances."  The district court did not provide any explanation or basis for the imposition of this discovery limitation, and it did not impose the same numerical limit on Defendants.  A one-sided order so severely limiting the number of witnesses that a plaintiff may call without any

explanation or apparent rationale would appear to raise the possibility of bias or the appearance of lack of impartiality.

Subsequently, in considering Defendants' motion for summary judgment, the district court ignored several sworn witness declarations Rorrer submitted in opposition to Defendants' motion for summary judgment (including declarations by two witnesses, Packard and Yoder, whom Rorrer had listed on the January 4, 2012 witness list but did not include in his pared-down, "Rule of 5" list), and it essentially granted Defendants' motion to strike the declarations based on the "Rule of 5" order. Although the "Rule of 5" order only referenced witnesses to be used at trial and did not expressly prohibit Rorrer from submitting sworn declarations in opposition to a motion for summary judgment, in addressing Defendants' motion to strike these declarations, the district court accused Rorrer of contravening the court's order and trying to "sandbag" the City. Specifically, the court stated:

> Initially, the Court finds that Rorrer clearly contravened this Court's order regarding the identification of witnesses when he provided the declarations at issue. The Court's order was designed to ensure that only necessary depositions would occur. It was not designed to allow Rorrer to sandbag Stow with wholly unanticipated declarations.
>
> The Court would note that to the extent a reviewing court would conclude that a genuine issue of material fact is generated by those precise declarations, the Court would find them to be properly stricken as in direct violation of Rorrer's obligation to identify witnesses in a timely manner to facilitate deposition practice.

In the case at hand, the district court judge's statements indicate that allowing the same district judge to preside over this case on remand would compromise "the appearance of justice." *Renal Care Grp.*, 696 F.3d at 532. Considered together with the questionably imposed discovery order, the district judge's statements are problematic. Although "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . . they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). In the instant case, the district judge reprimanded Rorrer—scolding

him for "clearly contraven[ing]" the discovery order by submitting sworn witness declarations in response to a summary judgment motion—and accused Rorrer of attempting to "sandbag" Defendants. The district court actually misconstrued its own discovery order, and it scolded Rorrer for behavior permissible under the order. The district court's discovery order required only that Rorrer submit the names of witnesses Rorrer believed, prior to the close of discovery, that he would most likely use at trial; it did not prohibit Rorrer from submitting witness declarations in opposition to a motion for summary judgment. In conjunction with the district court's imposition of one-sided discovery restrictions, the judge's remarks "compromise the appearance of justice." *Renal Care Grp.*, 696 F.3d at 532.

The district court's preemptive statement that it would strike the witness declarations that this Court might deem to be admitted properly suggests that the district judge may "reasonably be expected to have substantial difficulty in putting out of his . . . mind previously expressed views or findings." *Id.*; *see also United States v. Bistline*, 720 F.3d 631, 634 (6th Cir. 2013) (granting government's request to reassign case for sentencing where district judge said he would not send "somebody like [the defendant]" to prison).

As to the third factor, we do not believe that "reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Renal Care Grp.*, 696 F.3d at 532-33. "Any lost efficiency is not out of proportion to the gain in preserving the appearance of fairness." *United States v. Gapinski*, 422 F. App'x 513, 522 (6th Cir. 2011). This is not a case with a "complex factual record." *Cf. Villegas*, 709 F.3d at 580 (declining to reassign based, in part, on "the nature of [the] complex litigation with multiple experts and significant time spent in discovery"); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 239 (6th Cir. 2003) (declining reassignment based, in part, on the "extensive joint appendix and hundreds of pages of briefs"). Moreover, this Court's opinion affirming the dismissal of many of Rorrer's claims significantly streamlines the issues that remain in the case. Another district judge will not have trouble familiarizing himself or herself with the facts underlying Rorrer's

discrimination claims so that the parties may proceed to a fair and impartial trial on the merits in accordance with this Court's opinion.

All three factors militate in favor of reassigning this case. We agree with Rorrer that the district court's handling of this case was questionable and that reassignment is advisable to preserve "the appearance of justice." *Renal Care Grp.*, 696 F.3d at 532; *see also United States v. Hagby*, 20 F. App'x 299, 300-01 (6th Cir. 2001) (finding "the appearance of justice would best be preserved by reassignment" where the district judge forcefully expressed her dislike of drugs and imposed the maximum sentence available under the applicable guideline range, stating, "You just got the wrong judge"). We therefore grant Rorrer's request for reassignment to a different district judge on remand in order to avoid the appearance of partiality.

## VIII. Conclusion

Because genuine disputes of material fact remain regarding Rorrer's disability discrimination claims, we **REVERSE** the district court's grant of summary judgment to the City on Rorrer's ADA and Ohio discrimination claims and **REMAND** those claims for trial before a different district judge. We **AFFIRM** the district court in all other respects. In addition, although we have indicated that the district court's prior decision to exclude Rorrer's requested discovery related to other monocular firefighters was not an abuse of discretion, we leave to the discretion of the district court judge to whom the case is reassigned on remand the decision whether the interests of justice require further discovery, and if so, the scope of the discovery that should be permitted.