NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0019n.06

No. 17-1185

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 09, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JULIE BARLIA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MWI VETERINARY SUPPLY, INC., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:    BOGGS, BATCHELDER, and BUSH, Circuit Judges.

**BOGGS, Circuit Judge.**  Julie Barlia appeals an order granting her former employer's motion for summary judgment on her discrimination and retaliation claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12100 *et seq*.  The district court granted the motion on the grounds that Barlia did not show (1) that she qualified as disabled under the ADA, (2) that her employer's stated, non-discriminatory reason for discharging her was pretextual, or (3) that there was a causal link between her request for accommodation and several adverse employment actions, including her eventual discharge.  *Barlia v. MWI Veterinary Supply, Inc.*, No. 15-10243, 2017 U.S. Dist. LEXIS 9248, at *13, 14, 32 (E.D. Mich. Jan. 24, 2017).

Because Barlia has failed to offer significant probative evidence indicating that her employer's proffered reason was pretextual and because the evidence that she has provided is

legally insufficient to establish the requisite causal link for a retaliation claim, we affirm the district court's order.

I

A

MWI Veterinary Supply, Inc.,[1] ("MWI") is a distributor of animal-health products. On October 27, 2008, MWI hired Julie Barlia as an outside sales representative ("OSR") for southeastern Michigan. Barlia's job consisted of promoting and selling animal-health products and equipment to veterinary care providers in a designated sales territory. Throughout her time with the company, Barlia reported to Terry Walsh, MWI's Great Lakes Regional Manager.

As an OSR, Barlia was expected to hit 95 percent of her monthly and fiscal-year sales goals; but beginning in 2013, she struggled to do so. During fiscal year ("FY") 2013—which ran from October 1, 2012, until September 30, 2013—Barlia repeatedly missed the 95-percent target. In January, February, and March 2013, for instance, Barlia attained only 89.5 percent, 92.7 percent, and 93.9 percent, respectively, of her sales goals. Following the realignment of her territory in March—at which time several of her top accounts were given to Jeffrey Kloosterman, a newly-hired OSR—Barlia's monthly and annual sales goals were reduced by five percent. Despite this indulgence, Barlia once again missed her targets in April (92.8 percent), May (85.1 percent), June (87.8 percent), and September 2013 (91.5 percent). Her fiscal-year-end performance review reflected these results, scoring Barlia's quantitative performance as 1.87— just below a score of "meets expectations."[2] Barlia did, however, score well in several qualitative measures and garnered an "overall average score" of 2.42, somewhere between

---

[1] Appellee says that the correct name of its business is MWI Veterinary Supply Co.

[2] MWI employs a three-point scale to grade its employees. On this scale, '1' equates to "does not meet expectations," '2' means "meets expectations," and '3' stands for "exceeds expectations."

"meets expectations" and "exceeds expectations." She also had a fiscal-year sales average of 95.94 percent.

In FY 2014, Barlia continued to struggle. In October and November 2013, she again fell short of her 95-percent target.[3] In December 2013, Walsh spoke with Barlia about her performance during a two-day "ride-with," in which he accompanied Barlia on her sales calls.[4] A subsequent email, which summarized the content of their conversations during that ride-with, reminded Barlia that she had a 95-percent sales target, noted that her territory was "currently at 83% of [her] FY [20]14 goal," and suggested ways in which she could boost her performance. Furthermore, while Walsh complimented Barlia for doing a "great job" marketing one of her product lines, he also observed that "[t]erritory sales have leveled off, with a 3% growth during [calendar year 20]13, and -5% in FY14, to date." During the remainder of the fiscal year, Barlia continued to miss her target: between December 2013 and June 3, 2014, when she was discharged, Barlia met her sales target only once.[5]

On January 29, 2014, Barlia sent an e-mail to MWI's human resources director, Debby Ball, asking to be excused from an out-of-town national sales meeting ("NSM") that was scheduled for the following week. Barlia informed Ball that she had met with her endocrinologist "regarding some symptoms that [she had] been experiencing" and that he had "recommend[ed] that [she] not travel at this time." Barlia also provided a note from her endocrinologist, which stated that she had "experienced symptoms consistent with thyroid and hormonal imbalance," had "lost weight[] consistent with these issues," and was "being evaluated

---

[3] Barlia hit 88.5 percent of her sales goal in October and only 78.4 percent in November.

[4] The mere fact that Walsh conducted a "ride-with" with Barlia is not evidence of poor performance. In a declaration, Walsh stated that he "conducted ride-withs with [his] OSRs approximately 2-3 times per year, with a goal of visiting each OSR at least twice."

[5] Her performance, measured as a percentage of her sales goal, was as follows: December, 93.0%; January, 86.9%; February, 79.2%; March, 95.3%; April, 82.0%; May, 93.8%.

and treated." Her doctor accordingly requested that Barlia "not fly in an airplane or take any trips outside [her] geographic area." The next day, Ball informed Walsh that "[w]e have received a note from [Barlia's] medical provider indicating that she cannot currently travel outside of her sales region" and, therefore, that she "w[ould] not be attending the NSM."

In April 2014, after Barlia had missed her sales goal several more times, Walsh spoke to Ball about placing Barlia on a performance improvement plan ("PIP"). Subsequently, at Ball's request and based upon interviews of Walsh, MWI's human resources department drafted a PIP. On May 9, 2014,[6] Walsh delivered to Barlia the PIP, which cited the following issues: (1) fiscal-year-to-date, she had only met 86.5% of her sales goal, (2) she had not satisfied the requirement of selling one Chemistry Analyzer per quarter, and (3) she was "not meeting . . . Walsh's[] expectations in the frequency and quality of communication regarding [her] activities in the field and efforts to improve her sales budget." The PIP then described MWI's future expectations for Barlia, which included the requirement that "[e]ffective immediately, [she] must maintain an average of 95% of her monthly goal for the months of May, June[,] and July 2014." Barlia was also cautioned that if she failed to meet the objectives set forth in the PIP, "additional discipline up to and including termination of employment [would] occur." On May 14, 2014, Barlia returned a signed copy of the PIP to a human resources representative, noting that she did "not agree [that the] action [was] justified."

B

During the first quarter of calendar year 2014, MWI failed to meet its expectations with respect to the company's net income growth. As a result, MWI's leadership team began

---

[6] While Barlia asserts that "there is a dispute about the actual date that Defendant placed Plaintiff on the PIP," Reply Br. 8 n.9, she does not challenge the authenticity of an email sent to her by Jennifer Cossel, an MWI human-resources staffer, which is dated May 9, 2014, and states, "Attached is the [PIP] we discussed on the phone. Once you have had a chance to review the attached document please return a signed copy of it[.]" Nor does Barlia dispute the fact that during her deposition, she identified May 9, 2014, as "the day they put me on the PIP program."

"examining the impact of potential expense-reduction measures, including a potential workforce reduction."[7] To help with this process, on May 14, 2014, it directed Ball to generate a list of MWI's employees and their annual salaries. On May 20, 2014, MWI's President and Chief Executive Officer sent a company-wide e-mail informing staff of the company's most recent financial results and of MWI's plan to "implement significant expense-reduction measures." The email did not state, however, that MWI was considering laying off employees.

On May 27, MWI's Vice President of Eastern Sales, Spencer Breithaupt, directed the regional sales managers whom he oversaw—which included Walsh—to identify one or two candidates for layoff should MWI decide to reduce its workforce. Walsh selected Barlia because she (1) "was the only employee in [his] region on a PIP," (2) "had struggled with her sales over a long period of time," and (3) "had become disengaged from [her] position" following the realignment of her sales territory, as evidenced by her failure to "sufficiently communicate with [Walsh regarding] her activities in the field and [her] efforts to improve her sales." Walsh testified that while Barlia's performance played a "large role" in his decision, it was not "the largest" or "primary" factor. On June 3, 2014, MWI terminated Barlia's employment.[8]

## C

On January 21, 2015, after obtaining an Equal Employment Opportunity Commission ("EEOC") Right to Sue letter, Barlia filed suit against MWI, alleging that it had violated the ADA in two ways when it fired her. First, she contended that MWI had discriminated against her because it had fired her due to her disabilities, viz., adrenal insufficiency, hypothyroidism,

---

[7] Terry Walsh was not a member of the leadership team.

[8] Barlia was one of approximately 90 employees who were laid off at this time. This constituted approximately 4 percent of MWI's workforce. Walsh saw a comparable reduction in the number of OSRs whom he oversaw. Given that Walsh oversaw 21 OSRs, Barlia's discharge equated to a roughly 5-percent reduction in the workforce that he supervised.

mastocytosis, and histamine-release syndrome. Second, she alleged that MWI had retaliated against her for asking for an accommodation, viz., to be excused from the 2014 NSM.

On April 4, 2016, MWI filed a Motion for Summary Judgment. MWI argued, *inter alia*, that Barlia had failed to establish a prima facie case of either disability discrimination or retaliation or, in the alternative, had not shown that MWI's stated, non-discriminatory reason for firing her was pretextual. The district court granted MWI's motion on January 24, 2017.

With regard to Barlia's disability-discrimination claim, the district court concluded that it failed on multiple grounds. First, the court held that Barlia had not shown that she was disabled within the meaning of the ADA. *Barlia*, 2017 U.S. Dist. LEXIS 9248, at *13–14. Specifically, the district court found that Barlia's medical records did not establish that she had an impairment, *id.* at *15–21, and that those records, even if they were sufficient to show that Barlia was impaired, did not show that she was sufficiently impaired to qualify as disabled under the ADA, *id.* at *21. The district court also rejected Barlia's contention that she qualified as disabled under the "regarded as"-provision of the ADA. The court found that she had not only forfeited the claim by raising it in a perfunctory manner, *id.* at *23, but had also failed to "produce evidence of Defendant's belief that she was incapable of performing the functions of her job," *id.* at *24 (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1106 (6th Cir. 2008)).

Furthermore, the district court held that even if Barlia had established a prima facie case of disability discrimination, she had not shown that MWI's stated, non-discriminatory reason was pretextual. *Barlia*, 2017 U.S. Dist. LEXIS 9248, at *24. Contrary to Barlia's assertions, the court said that the record "unequivocally" demonstrated that Walsh had placed Barlia on a PIP prior to learning of a possible workforce reduction, thereby refuting her claim that the PIP was

devised as cover for her eventual firing. *Id.* at \*26. The court further found that the record did not support Barlia's contention that non-disabled OSRs were treated more favorably despite inferior performance. *Id.* at \*27–28.

Finally, because Barlia had not shown that MWI's stated, non-discriminatory reason was pretextual, the district court concluded that Barlia's retaliation claim also failed. *Id.* at \*32–33. Alternatively, it found that the claim failed because Barlia did not offer evidence that would establish a causal connection between her accommodation request and an adverse employment action. *Id.* at \*35–37.

## II

We review de novo a grant of summary judgment. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). A summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Given this standard, the moving party "bears the initial burden of establishing an absence of evidence to support the non[-]moving party's case." *Copeland v. Machulis*, 57 F.3d 476, 478–79 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Should the moving party meet this burden of production, however, the onus shifts to the non-moving party to offer "significant probative evidence tending to support the complaint." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Allegations unsupported by the record, therefore, cannot defeat a properly supported motion for summary judgment, Fed. R. Civ. P. 56(c)(1); nor can "[t]he mere existence of a scintilla of evidence" in favor of the non-moving party's position, *Copeland*, 57 F.3d at 479. In making these various determinations, we consider "the facts and any inferences [that can be] drawn from the facts in

the light most favorable to the non-moving party." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc).

III

In the absence of direct evidence of disability discrimination, we apply the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016); *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 707 (6th Cir. 2015). Under this approach, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To make out a prima facie case of disability discrimination, a plaintiff must show that "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). Where the employee was discharged as part of a workforce reduction, the fifth element of the framework is modified to account for that circumstance. *Arthur*, 625 F. App'x at 707. In such instances, "the plaintiff [need only] introduce 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Ibid.* (quoting *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

Should the plaintiff establish a prima facie case of discrimination, the employer must "articulate some legitimate, non[-]discriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802; *Ferrari*, 826 F.3d at 892. If the defendant meets this burden of production, the plaintiff must introduce evidence showing "that the proffered reason was not the true reason for

the employment decision." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Under this scheme, the ultimate burden of persuasion remains at all times with the plaintiff. *Hicks*, 509 U.S. at 507.

## A

To qualify as disabled under the ADA, an individual must: (1) be actually disabled, i.e., suffer from "a physical or mental impairment that substantially limits one or more major life activities," (2) have "a record of such an impairment," or (3) be "regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" include, but are not limited to, performing manual tasks, walking, standing, concentrating, thinking, and working, as well as the operation of major bodily functions, such as endocrine functions. 42 U.S.C. § 12101(2). An individual qualifies as disabled under the "regarded-as" prong of § 12102(1) if he or she (1) "establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity" and (2) the impairment is not "transitory and minor." 42 U.S.C. § 12102(3).

The ADA also includes a number of rules of construction. Having concluded that the courts were defining "disability" too narrowly, Congress amended the ADA in 2008 to state that the term should be construed "in favor of broad coverage . . ., to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A); ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). Moreover, Congress explicitly rejected a number of standards formulated by the Supreme Court, such as the requirement that the impairment be "permanent or long-term" to qualify as a disability under the ADA. 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a

major life activity when active."); ADAAA § 2(b)(4) (stating that a purpose of ADAAA is to "reject . . . standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002)," which included the requirement that an impairment's impact be "permanent or long-term" to qualify as a "substantial limitation"). Congress also cautioned that "the question of whether an individual's impairment is a disability . . . should not demand extensive analysis." ADAAA § 2(b)(5).

Given these directives, the district court erred in finding that no reasonable trier of fact could conclude that Barlia qualified as "actually disabled" under the ADA. First, contrary to the district court's assertion, Barlia produced sufficient evidence tending to show that she suffered from hypothyroidism. In June 2010, Barlia took leave under the Family and Medical Leave Act for "fatigue [and] decreased mental clarity." In her application for leave, Barlia included a note from her physician, which described Barlia as "present[ing] [with] extreme fatigue, peripheral neuropathy, thyroid disorder[,] and decreased mental clarity." The physician further stated that Barlia was receiving "[t]reatment . . . aimed at rebalancing [her] thyroid and adrenal glands." Barlia's June 2012 medical records provide additional, significant, and probative evidence of a thyroid disorder, as they list Synthroid—a drug that treats hypothyroidism, *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 430 (6th Cir. 2016)—among her medications. And in his 2014 note to MWI asking that Barlia be excused from the annual NSM, Barlia's endocrinologist described her as "experience[ing] symptoms consistent with thyroid and hormonal imbalance." Given that hypothyroidism is an affliction of the endocrine system, a reasonable trier of fact could conclude that Barlia suffered from an "impairment . . . that limits one or more major life activities." *See* 42 U.S.C. § 12102(2)(B) (including "the operation of . . . the endocrine system" among the list of "major life activities").

The district court erred because it overlooked the significance of Barlia's Synthroid prescription. In holding that Barlia's medical records were insufficient to create a genuine dispute over whether she suffered from one or more of the physical impairments named in her complaint, the district court focused on the seeming absence of a formal diagnosis. *Barlia*, 2017 U.S. Dist. LEXIS 9248, at *16 ("[W]hile Plaintiff has produced two-page summaries of two visits to her physician, there is no indication that the conditions identified in the 'Problem Lists' for these visits [including hypothyroidism] reflect actual diagnoses by a medical professional, as opposed to, say, patient complaints or potential concerns that required further investigation." (citation omitted) (footnote omitted)). However, these same records also list Synthroid among Barlia's medications. Given that physicians are not in the habit of prescribing drugs for diseases that they have not diagnosed, Barlia's records substantiate a diagnosis of hypothyroidism.[9]

Second, Barlia has provided enough evidence to create a genuine dispute as to whether hypothyroidism had "substantially limit[ed]" one or more of her major life activities. To be considered substantially limiting, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity." 29 C.F.R. § 1630.2(j)(1)(ii) (2017). Rather, it need only "substantially limit[] the ability of [the] individual to perform a major life activity as compared to most people in the general population." *Ibid.* This determination is to be made "without regard to the ameliorative effects of mitigating measures such as . . . medication," 42 U.S.C. § 12102(4)(E)(i)(I), and where the impairment is "episodic or in remission," the assessment turns on whether it "would substantially limit a major life activity

---

[9] As the district court correctly notes, Barlia's medical records state that there is "[n]o evidence of adrenal insufficiency." *Barlia*, 2017 U.S. Dist. LEXIS 9248, at *17. Such an entry does not disturb our assessment, as hypothyroidism is not the same as adrenal insufficiency.

when active," 42 U.S.C. § 12102(4)(D). "[U]sually [this comparison] will not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(1)(v) (2017).

Though it is a closer call, Barlia has offered significant probative evidence indicating that her hypothyroidism, when it flared up, and in the absence of medication, substantially limited her ability to perform a major life activity as compared to most people in the general population. As Barlia correctly notes, hypothyroidism is, by definition, an impairment of the endocrine system. In this limited respect, then, it is akin to diabetes, which the Code of Federal Regulations classifies as a "substantial[] limit[ation of] endocrine function." 29 C.F.R. § 1630.2(j)(3)(iii) (2017). Barlia's medical records and self-reporting provide further probative evidence on this matter. When her hypothyroidism flares up, Barlia suffers "extreme fatigue," reduced cognitive functioning, and bouts of severe dizziness. Given that the ADA lists concentrating and thinking as "major life activities," 42 U.S.C. § 12102(2)(A), and because Congress has directed us to construe the Act "in favor of broad coverage," 42 U.S.C. § 12102(4)(A), we hold the foregoing evidence sufficient to create a genuine dispute over whether Barlia qualified as disabled under the ADA.[10]

B

While Barlia has shown that there is a genuine issue as to whether she was actually disabled, more is needed to establish a prima facie case of disability discrimination. In addition, Barlia must provide evidence tending to show that (1) she was otherwise qualified to be an OSR, (2) she suffered an adverse employment decision, (3) MWI knew or had reason to know of her disability, and (4) she was singled out for discharge for impermissible reasons. *Arthur*, 625 F. App'x at 707. Given that MWI asserts that (1) it did not know of her disability, (2) Barlia was

---

[10] In light of this judgment, we need not consider whether the district court erred in finding that Barlia had failed to show that she qualified as disabled under the "regarded-as" prong of 42 U.S.C. § 12102(1).

not qualified for her position, and (3) she was not singled out for discharge for impermissible reasons, it is not immediately clear that Barlia has carried her burden under the first step of *McDonnell Douglas*.

However, we need not pursue this line of inquiry because it is ultimately irrelevant to the disposition of this case. As we discuss in the next section, the district court was correct to grant MWI's Motion for Summary Judgment on Barlia's disability-discrimination claim because Barlia has not produced evidence indicating that MWI's stated, non-discriminatory reason for firing her was pretextual.

IV

As noted above, even were we to have found that Barlia had established a prima facie case of disability discrimination, MWI could rebut the presumption by providing a legitimate, non-discriminatory reason for her discharge. *McDonnell Douglas*, 411 U.S. at 802. MWI has proffered such a reason, asserting that Barlia was fired as part of a company-wide workforce-reduction plan and that she was chosen due to her poor performance, as evidenced by her being the only OSR in her region on a PIP. The burden, therefore, is on Barlia to offer significant probative evidence showing that MWI's stated reason was pretextual. *Hicks*, 509 U.S. at 508. She fails to do so.

To survive a motion for summary judgment, Barlia need not prove that MWI's stated reason is pretextual; rather, she must "prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Whitfield*, 639 F.3d at 260. A plaintiff can meet this burden by showing one of three things: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Ferrari*, 826 F.3d at 895 (quoting *Romans v.*

*Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). However, because "[t]his court has adopted an 'honest belief' rule[,]" a plaintiff does not meet her burden if she simply shows that the defendant's stated reason was incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998)). Under this rule, "a reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false[] and that discrimination was the real reason." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Hicks*, 509 U.S. at 515). As such, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Tingle*, 692 F.3d at 531 (alteration in original) (internal quotation marks omitted) (quoting *Chen*, 580 F.3d at 401).

Barlia offers two grounds to show that MWI's explanation is pretextual. First, she cites the timing of her placement on a PIP, which she alleges occurred on "the same day that Ball and Walsh met to prepare a roster of employees to be considered as part of the lay-off." Reply Br. 8. This evidence, Barlia contends, indicates that the PIP was contrived as cover for her later dismissal.

This assertion is demonstrably false. As the district court correctly noted, the record incontrovertibly establishes that Barlia was placed on a PIP on May 9, 2014. Not only do email records establish that she received her PIP on that date, but Barlia also stated during her deposition that May 9, 2014 was "the day they put me on the PIP program." Furthermore, Barlia offers no evidence that calls into question Walsh's and Ball's assertions that they began discussing this PIP in April. At the same time, the record shows that Ball and Walsh only

became aware of the workforce-reduction plan several days *after* they placed Barlia on a PIP. Ball identified May 14, 2014 as the day she was "asked to generate a list of all of MWI's employees and their annual salar[ies], [in order] to assist MWI's leadership team in examining the impact of potential expense-reduction measures, including a potential workforce reduction." Similarly, Walsh testified that he first learned of MWI's workforce-reduction plan on May 27, 2014. As such, there is no evidentiary support for Barlia's first argument.

Second, Barlia argues that MWI's proffered reason should be deemed pretextual because there were non-disabled OSRs in her region with worse sales records who were not placed on a PIP. Barlia identifies Carrie Visser, Andrew Bennett, and Jeff Kloosterman as those with inferior performances. Upon closer inspection, however, the record does not contain evidence that creates a genuine issue as to whether MWI (1) reasonably and honestly judged Barlia's performance to be inferior to that of her co-workers and (2) used this determination as a basis for its subsequent employment decision.

As regards Bennett and Visser, the evidence is clear: despite performing slightly worse than Barlia in FY 2013, both outperformed her by a wide margin in the first eight months of FY 2014. In FY 2013, Bennett performed worse than Barlia both in terms of his monthly and annual performances. While Barlia missed her 95-percent sales target in seven out of twelve months and had an overall sales average of 95.94 percent, Bennett fell short of his target nine times and had an annual average of 92.9 percent. As for Visser, while her monthly performance was comparable to Barlia's—she too missed her 95-percent sales target seven times—her overall average for the year was only 94.86 percent. Fiscal year 2014, however, tells a vastly different story. Whereas Barlia missed her target in seven of eight months, Bennett and Visser fell short of their monthly goals only three times each. Moreover, whereas Barlia's overall sales average

for that period was only 87.14 percent, Bennett and Visser each had an average that was over 100 percent. Visser and Bennett therefore had objectively better sales records than Barlia in the period preceding the workforce reduction, and their performance trajectory was upward while Barlia's was downward. Thus, there is no evidence whatsoever to indicate that MWI did not reasonably and honestly rely on the particularized facts before it when deciding to terminate Barlia's employment rather than Bennett's or Visser's.

Barlia's pretextual claim therefore hangs on a comparison of her performance to that of Kloosterman's. First, it bears noting that the record supports Barlia's contention that Kloosterman's sales performance was worse than hers. Despite similar performances in FY 2013 and their both having a downward sales trajectory in FY 2014 (as measured in terms of their overall sales average), Barlia clearly outperformed Kloosterman in the eight-month period immediately preceding her discharge. While both missed their 95-percent monthly sales goals seven times in FY 2014, Barlia's overall average was superior—87.14 percent for Barlia versus 82.66 percent for Kloosterman. Moreover, Kloosterman's downward trajectory with his sales performance was steeper. Given these facts, Barlia would have shown that a genuine dispute exists with respect to the issue of pretext had Walsh (1) placed Barlia on a PIP solely because of her lagging sales performance and (2) nominated her for discharge based solely on the PIP.

Barlia's PIP and discharge, however, were based on more than just her sales performance. In placing Barlia on a PIP, Walsh cited her failure to meet "expectations in the frequency and quality of communication regarding [her] activities in the field and efforts to improve her sales budget." The importance of this consideration to Walsh's decision-making is emphasized by the fact that he nominated Barlia for discharge because, *inter alia*, she "had bec[o]me disengaged from [her] position" after the realignment of her territory. Kloosterman, in

contrast, "continuously communicated with [Walsh] to show [that] he was engaged and working to regain and improve his market share." Since Barlia does not offer even a scintilla of evidence that would refute (1) that Kloosterman's non-sales performance was superior to her own or (2) that Walsh reasonably and honestly relied on this difference in deciding to place her on a PIP and, subsequently, to nominate her for discharge, she failed to create a genuine dispute regarding pretext.

The district court was therefore correct to grant MWI's motion for summary judgment on Barlia's disability-discrimination claim.

V

Barlia also contends that the district court erred in granting MWI's motion for summary judgment on her retaliation claim. As regards the claim itself, Barlia alleges that MWI punished her in various ways for engaging in an activity protected by the ADA, requesting that she be excused from the January 2014 NSM. Barlia identifies three such alleged penalties: being denied a "ride-with" in March 2014, being placed on a PIP in May 2014, and being terminated in June 2014.[11]

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this [Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). In the absence of direct evidence—as is the case here—an ADA claim of retaliation is analyzed according to the

---

[11] While being placed on a PIP and being discharged certainly count as adverse actions, it is unclear that the lack of a "ride-with" qualifies as such, especially given that Barlia provides no evidence suggesting that she was denied one or that such an alleged absence was unusual. Barlia simply asserts that Walsh cancelled a ride-with that had been scheduled for March 2014; however, that claim is not supported by the record. Barlia cites to a memo that Walsh wrote following their December 2013 ride-with, yet this memo merely states, "We will revisit your progress toward achieving your goal at the end of March with expectations of meeting [illegible]." Walsh does not mention, let alone schedule, a future ride-with.

*McDonnell Douglas* burden-shifting framework. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation. *A.C. v. Shelby County Bd. Of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). This requires her to show that "(1) [she] engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against [her]; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer*, 743 F.3d at 1046.[12] "Significantly, the causation prong requires [the plaintiff] to show but-for causation." *Sharp v. Profitt*, 674 F. App'x 440, 450 (6th Cir. 2016) (citing *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc)). If the plaintiff meets this burden, then the onus shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). In the event this occurs, the burden shifts back to the plaintiff to show "that the proffered reason for the action was merely . . . pretext[.]" *Ibid.*

Barlia fails to establish a prima facie case of retaliation because she does not offer evidence tending to show a causal connection between the protected activity and the adverse employment actions. The extent of Barlia's evidence is (1) that her request for accommodation temporally preceded the adverse actions and (2) that there were other OSRs "who did not engage in protected activity and were treated more favorably despite comparable or worse sales records." Appellant Br. 33. Since the latter assertion misstates MWI's proffered, non-discriminatory reason for firing Barlia—MWI did not allege that it relied solely on sales

---

[12] In its order, the district court stated that "[a]t the first stage of this inquiry, Plaintiff must establish the *three* elements of a *prima facie* case: (i) that she engaged in protected activity, (ii) that she suffered an adverse employment action, and (iii) that there is a causal link between her protected activity and the adverse employment decision." *Barlia*, 2017 U.S. Dist. LEXIS 9248, at *33 (first emphasis added) (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007)). The test, as stated in *Bryson* and *Barlia*, is therefore missing a component articulated in *Rorrer*: that the employer knew of the protected activity. This difference does not matter, however, as one cannot satisfy the causation-prong of the test without showing that the employer knew of the protected activity.

performance when making its personnel decisions, *see supra* Part IV, pp.15–17—Barlia's claim rests solely on the temporal relationship between the various events. We have been clear, however, that only "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity [is] temporal proximity between the events . . . significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Ibid.* Since significant time elapsed between Barlia's protected activity and the adverse actions—roughly three months passed between Barlia's request for accommodation and her being placed on a PIP, and then, another month passed before Barlia was discharged—this evidence is insufficient to create a genuine dispute on the matter of causation.

While it is true that "[e]stablishing a prima facie case of retaliation is a low hurdle," *Rorrer*, 743 F.3d at 1046 (internal quotation marks omitted), it remains a hurdle nonetheless. Barlia does not clear it.

VI

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to MWI.